## Shortz *against* Unangst.

Rules agreed upon by two congregations, Lutheran and Reformed, reciting that they had taken up land and built a church, and regulating their respective titles to and rights in the same, and also the modes of conducting worship, of electing trustees, and ministers, and rights in the burial ground, are within the recording Act of 1775, and with a subsequent deed from a third person, assigning the legal title to trustees for the use of the congregations, accompanied with ancient possession, are evidence to show title.

Where there is a deed of land to trustees, their heirs and assigns, the surviving trustee may assign, in the absence of any proceeding to restrain him.

Merely being one of a church council, without any concern in a suit brought for the use of the church, or personal interest in the result, does not disqualify a witness.

Evidence not apparently material may be admitted or rejected, without necessarily being error.

A nominal plaintiff in a suit having disclaimed and being in an adverse position, was notified to produce a bond of indemnity given to him by the person who had used his name in the suit; he admitted in court that he had burnt it: *held* a copy was admissible in evidence.

A meeting of members of a society having determined to refuse a charter, *held* that evidence that its contents were misrepresented to them was not admissible.

Before a charter can be considered as accepted by or binding on a religious society, it must appear that they were notified of it, and that they duly met together to consult and deliberate upon it, and that they accepted it in their associated capacity.

Carrying such a charter round among the members and privately procuring their signatures without any meeting or notice, do not constitute the assent of the society, nor bind any not parties to it.

THIS was a writ of error to the Common Pleas of *Northampton* county. It was an action of trespass *quare clausum fregit* brought by Joseph Unangst and Christian Brown, against Abraham Shortz and others, in which a verdict and judgment were

rendered in favour of the plaintiffs below. It was the same case which was brought up and reversed on a former writ of error, and is reported in 5 *Whart.* 506.

The plaintiffs offered in evidence the record of certain articles of agreement, without date, acknowledged July 18th, 1789, and recorded 16th January 1833; which read as follows:

RULES OF THE LUTHERAN CONGREGATION OF THE DRYLAND CHURCH. — In the name of Jesus, Amen. Whereas we, the two Lutheran and Reformed Congregations, have united in building jointly, to the honour of the Lord, a new stone church, we say above all: My God remember ourselves after thy goodness, and promote, thyself, the work of thy honour, Amen.

State of Pennsylvania, county of Northampton, township of Bethlehem, and the so called Dryland, the 5th day of June 1788, We, both Christian Congregations, the Reformed and Lutheran, have chosen (named) and taken up a piece of land and ground of 7 or 8 acres, be the same more or less, which is to remain in our own and our posterity's (successors') possession for ever. The (said) piece of 7 or 8 acres is adjoining E. land of Frederick Kreider, W. of Matthaeus Weidknechts, S. Wuesters, N. Jonas Hertzel's land, situate on the road leading from Bethlehem to Nazareth.

Whereas, the house of the Lord is jointly built only by the two congregations, for ourselves and our posterity, and which we also shall keep; We, the elected master-builders (trustees) of both Christian congregations, in our as well as the names of both congregations, make the laws for ourselves and our posterity, as regards the preservation of the church, its discipline and government.

1. That the above described piece of land shall for ever remain the land, and on which no more than one church and school-house, in common, are to be erected.

2. These 7 or 8 acres, school and church land, shall, in case of purchase, be jointly bought and paid for by both congregations.

3. The number of trustees, which have just now been elected, shall always be retained (remain in office) in our church; in case, some way or other, a vacancy of the trustee shall take place, said vacancy shall be filled up by the majority of votes (of the congregations).

4. The trustees shall in conjunction with and by consent of the elders and wardens, have the right to elect and remove the minister.

5. The resolution of the trustees, elders and wardens, as regards the election and removal of the minister, shall be fully binding, if two-thirds are agreed.

6. At the election of an elder and warden, as well as the election of a trustee by the congregation, the minister shall have an

equal right in electing elders and wardens (to vote for); shall, however, have but one vote.

7. In case one of these two congregations should intend to call or elect a minister, he shall be bound to prove his ordination.

8. No (other) minister shall preach in this church, except by the consent of the (regular) minister and vestry, whose part it is at such a time to direct public worship.

9. Public worship shall be held in the same manner, as heretofore, to wit: The Reformed as well as the Lutheran Congregations shall hold public worship every two weeks (in rotation); one congregation shall have as much right as the other; but should, for certain reasons, the Sundays be changed, (the preaching in rotation every two weeks), it shall be decided by the majority of the vestry in both congregations.

10. The elected trustees shall, during worship, occupy in church one of the front seats, the elders and wardens shall have the next seat. Those (of the trustees, &c.,) shall occupy the front seat, on whose side worship is held.

11. The expenses requisite for administering the Lord's Supper, shall be taken from the collection money.

12. There shall be rendered an annual church account, and the money remain (kept) in common, until the church is paid; after this, each congregation shall apply their collection money to their benefit, without being accountable for it to the other.

13. Should it become necessary to erect or repair a school-house, both congregations shall build and keep it in repair, without taking the costs from the collection money, except it be done by mutual consent of both congregations.

14. Each holy day, a collection is to be taken up, which is always to go to the repairs of the church.

15. Both congregations shall have the right to erect tomb-stones for their deceased (friends).

16. At no time whatsoever, (now and never), no minister, whoever he may be, shall have permission to preach in this church, except he be a Christian Reformed or a Christian Lutheran Minister.

TRUSTEES.— Matthaeus Koenig, George Michael, Matthias Gress, George Schortz.

ELDERS. — Adam Stocker, [his ⋈ mark], Conrad Georg, Peter Rieser, Michael Koehler.

· Which being objected to, the plaintiffs offered in evidence, in connection therewith, a deed, dated June 10th, 1794, and recorded 25th June 1794, from Sarah Wistar to Matthias Gress and Christian Brown, for the premises on which the Dryland Church is erected, as follows:

Deed; Sarah Wistar to Matthias Gress and Christian Brown—consideration, £25 — conveying to the grantees and to their heirs and assigns, " a certain tract or piece of land situate in Nazareth

[Shortz v. Unangst.]

township, in the county aforesaid, (on which the German Lutheran and Reformed congregations or religious societies of the said township and its neighbourhood, have erected a place of worship called the Dryland Church, and part thereof used by them as a burial-place); beginning at a post in the middle of the road leading from Bethlehem to Nazareth, thence by the said Sarah Wistar's 500 acre tract, west 31 perches, to a post; thence by other part of Sarah Wistar's 100 acre tract, whereof this is part, north forty degrees, east 59 perches to a post, thence by other land in possession of said congregations, east 9 perches to a post, and south 15 perches to a post in the middle of the aforesaid road; thence by the same, south twenty-eight degrees, west 34 perches, to the place of beginning, containing 6 acres and 20 perches, and allowance, &c. Together, &c. To have and to hold to the grantees, their heirs and assigns for ever, in trust, nevertheless, for and as a site for one or more houses of religious worship, and a burial-place for the use of the said German Lutheran and German Reformed congregations or religious societies aforesaid. And upon this further trust and confidence, that they, the said Matthias Gress and Christian Brown, and the survivor of them, his heirs *and assigns*, shall and will permit and suffer the said premises hereby granted, and the buildings thereon erected and hereafter to be erected from time to time, and at all times hereafter, for ever, to be at the disposal and under the care, regulation and management of the said two several religious societies or congregations aforesaid, and to and for no other use, intent or purpose whatsoever."

To be followed, as they alleged, by proof of possession under them, from the date thereof to the present time.

To the admission of which deed and articles of agreement in evidence, the defendants objected, as irrelevant to the issue trying, and that no title in the grantors was shown, that said articles of agreement was no deed of conveyance, no grantor nor any title in the parties shown, that it was not such a paper, the record whereof was evidence within the recording Act. That so much of it, at least, as related to church government, was not evidence, and that if the paper were evidence, the original should be produced or accounted for, and that no possession accompanying it had been shown.

The court, on argument, overruled the objection, and admitted the deed and articles of agreement in evidence; to which decision of the court the defendants excepted, and the court sealed a bill of exceptions.

It was then admitted by the defendants, that Christian Brown, one of the grantees in Sarah Wistar's deed, was dead; and the plaintiffs thereupon offered in evidence a deed dated the 21st day of April 1837, and recorded 21st April 1837, from Matthias Gress, who survived Christian Brown, to Joseph Unangst and Christian Brown, for the premises aforesaid, as follows:

[Shortz v. Unangst.]

Deed; Matthias Gress to Joseph Unangst and Christian Brown, dated the 21st day of April, A. D. 1837. Reciting the grant of Sarah Wistar, the death of Christian Brown the elder, whereby the trust vested in Matthias Gress — and that the said Matthias Gress thought it expedient, by the power and authority given unto him by the aforesaid deed of trust, as the survivor of them, to convey and assign the same unto Joseph Unangst, in trust for the German Lutheran congregation, and Christian Brown in trust for the German Reformed congregation aforesaid, and to their heirs and assigns for ever. Therefore the said Matthias Gress, in consideration of $5, to him in hand paid by the said Joseph Unangst and Christian Brown, conveyed to them and their heirs and assigns, all that certain tract or piece of land, &c., (the same tract granted by Sarah Wistar, mentioned in the aforesaid deed from Sarah Wistar to Matthias Gress and Christian Brown), to have and to hold the said tract, &c. unto the said Joseph Unangst and Christian Brown, their heirs and assigns for ever, in trust, nevertheless, for and as a site for one or more houses of religious worship, and a burial-place for the use of the said German Lutheran and German Reformed congregations or religious societies aforesaid. And upon this further trust and confidence, that they the said Joseph Unangst and Christian Brown, and the survivor of them, their heirs and assigns, shall and will permit and suffer the said premises hereby granted, and the buildings thereon erected and hereafter to be erected, from time to time, and at all times hereafter for ever, to be at the disposal, and under the care, regulation and management of the said two several religious societies or congregations aforesaid, and to and for no other use, intent and purpose whatsoever.

To the admission of which in evidence, the defendants objected that it did not appear that either Joseph Unangst or Christian Brown had been selected or chosen by either of the congregations as trustees. That Matthias Gress could not convey the trust estate without the consent of the *cestui que trust,* and that the same was not relevant to the issue trying.

The court overruled the objection, and admitted the deed in evidence; to which the defendants excepted, and the court sealed a bill of exceptions.

The plaintiffs then called George Frederick as a witness; to whose competency the defendants objected on the ground of interest, and that he was one of the alleged church council, for whom the plaintiffs claimed to be trustees; which was admitted by the plaintiffs to be the fact.

The court overruled the objection, and admitted the witness; to which the defendants excepted, and the court sealed a bill of exceptions.

The defendants offered to prove, by the same witness, that John G. Koehler and Abraham Shortz, were descendants of George Shortz and George Koehler, whose names are alleged to be signed

III. — 7         E

to the articles of 5th June 1788.   To which the plaintiffs objected; and the court sustained the objection, and rejected the evidence. The defendants excepted, and the court sealed a bill of exceptions.

The defendants next offered to prove by this witness, that from time immemorial, it has been the custom in the congregation, with the assent of the church council and congregation, to permit any portion of the congregation to have service by a regular Lutheran minister, on funeral, harvest, and other occasions.

To which the plaintiffs objected, and the court, after argument, sustained the objection, and rejected the evidence; to which decision of the court the defendants excepted, and the court sealed a bill of exceptions.

The plaintiffs thereupon offered in evidence a copy of a bond of indemnity to Christian Brown, one of the plaintiffs; also a copy of a letter from Joseph Unangst, to Christian Brown, to which the defendants objected, and the court rejected the evidence: whereupon Mr Hepburn, one of the defendants' counsel, addressed Mr Brown, (he being in court), and asked what he did with the bond: Mr Brown replied that he burned it up; the plaintiffs then renewed their offer to give the bond and letter in evidence, to which the defendants again objected: and the court, after argument, overruled the objection, so far as it related to the admission of the bond in evidence; and admitted the bond to be read in evidence; and rejected the copy of the letter; to which decision of the court, permitting the copy of the bond to be given in evidence, the defendants excepted, and the court sealed a bill of exceptions.

The defendants proposed to prove, by the witness, that at the meeting of the 13th April 1837, General Shimer misrepresented the contents of the charter, by asserting that it contained provisions which are not found in it.   To which the plaintiffs objected; and the court sustained the objection, and overruled the evidence. To which the defendants excepted; and the court sealed a bill of exceptions.

Charge of the court:

The rights of the parties had their origin in an article of agreement dated the 5th of June 1788.

The title to the land was conveyed by Miss Wistar to Gress and Brown, by deed dated the 10th of June 1794.   Gress and Brown were the trustees of the two congregations, and as such held the title to this tract of land.   Brown having died, Gress, the survivor, by his deed dated the 21st of April 1837, conveyed the lands to the plaintiffs, on the same terms, and subject to the same trusts mentioned in the Wistar deed.   This last deed was valid, and by it the plaintiffs succeeded to all the rights of the original trustees.   They held the legal estate.   The congregations have the right to use it as stipulated in their articles of association. The deed passed the freehold to the plaintiffs, and gave them the

possession, so far as to enable them to sustain an action against the wrong-doers.

The articles of agreement are the guide to determine the rights of the two congregations and their members to this church property. They have so made it, and we must take it as the intention by which to test their rights, in relation to the preservation of the property, and the discipline and government of the respective churches. It is their fundamental law — a constitution to limit and secure their temporal and religious rights as associate members.

The defendants do not deny their breaking open and entering into the church. They admit this, and seek its justification under their rights as church members. Assuming this to be the true and legitimate aspect of the case, and it is so, the only question to be decided is, have they a right to do what it is proved they did do?

It is proved that the object of the defendants, in opening the church, was to have public worship in it. By the articles of agreement, which are the law of the church, the consent of the regular minister and vestry is necessary to give a right to preach in this church. The church council is the only power to elect a minister, in case of vacancy, or to remove one in case of misbehaviour. If the office of minister is filled, no one can preach in this church except by his consent, and that of the vestry. If the office of minister is vacant, no one can preach there except by consent of the council.

Was the office of minister full? If so, had the defendants permission to enter from the minister and vestry? If they had, they are justified. Was the office of minister vacant? If so, had they the permission of the other branches of the church council? If they had, they are justified. Unless they had permission in one of the two cases just stated, they had no right of entry; and your verdict must be against them.

In sustaining their defence, the defendants must stand on the strength of their own right. Their legal defence must consist in their own right; and if they fail to establish this, a want of right in their opponents' church organization will not help them. The plaintiffs have the legal title, and may wield it so as to correct a violation of right by either contending branch of this church.

The great inquiry is as to the right of the defendants; and all the testimony on this point, or as far as it relates to the facts, is left to you: you heard it all, and will decide it for yourselves.

Under what right did the defendants enter? Was it by the consent of the vestry, or was it under the charter? You will decide this point.

The disclaimer of Christian Brown, and his consent, does not aid the defendants. The Supreme Court has decided that this gives no right, affords no protection, and does not interfere, in any way, so as to impair or defeat this action.

[Shortz v. Unangst.]

In answer to the defendants' point, we say that the trustees in the deed, and much less one of them, could not give permission to place a clergyman in that church. This could be done only in the way prescribed in the agreement; and with this the legal trustees have nothing to do.

If the defendants entered in right of their charter, then it becomes material to determine what rights this instrument gave them.

When this case was formerly tried before this court, I considered this subject, and will now repeat to you what I then said to the jury, as nothing has since taken place, that tends to change my opinion on this point.

A religious community such as this was constituted by its articles of association might alter its rules and regulations. This change might be effected by an Act of incorporation legally invoked. How should this be done? It must be done by the congregation. The congregation should be notified. As being preparatory to a change in their constitutional existence, the object of convening the meeting should be communicated in the notice. This would apprise the members of what was to be done, and if they did not attend, they could not complain. When thus assembled, the decision of the majority would be binding. There is no other way of determining questions in such a community unless their articles or rules directed some other mode. Here no other rule was directed.

Here there is a total absence of all the evidence requisite to establish that the congregation ever agreed to or authorized any one to make and obtain this charter. No meeting was ever called, no notice was ever given to the congregation on the subject of this charter. Those in favour of it knew it, no doubt; but those opposed to it were designedly kept in utter ignorance of what was in progress. I may safely ask, where is the evidence that the congregation ever decided that this charter should be obtained? The absence of all evidence on this point is sufficient to warrant the conclusion, that no such proposition was ever submitted to the action of the congregation.

When or how this charter was concocted we have not been informed; all we know of it is that it was carried around through the country, and the signatures which are to it were thus obtained. This is not the assent which is necessary to bind the congregation. It would bind those who signed it, but beyond this it would not bind any other member of the congregation. Here no deliberation or act of the members was had jointly, touching this charter. There was no joint consultation or discussion by the members on the subject, nor was there any opportunity for that joint deliberation, advice, consultation, discussion, and action by the members of this church, by which they ought to be bound. It is altogether idle and repugnant to good sense and moral honesty to

[Shortz v. Unangst.]

tell men that those who were opposed to this charter might have followed it to the Supreme Court, at Philadelphia, and to the executive at Harrisburg. They were not bound to pursue its trail in obtaining this public highway assent of part of the members, nor before the Supreme Court, and executive. To obtain the assent of the members at one time and another at a different time, successively and in detail, will not bind the congregation, unless every member should assent to it. It would not bind him who did not assent to it.

The members should have been assembled in congregational counsel. They should have deliberated jointly. They should have acted unitedly. They should have expressed their assent and dissent in their associate capacity, and then the result duly announced, would have been binding upon all the members. Any other mode of proceeding would be subversive of the first principles of justice, and leave no safety to the members.

If I am right in what I have said, this charter neither alters nor diminishes the rights of those who did not agree to it. It, therefore, can have but little, if any, operation in this cause. It gave those who are parties to it no right against the other members, who are not parties to it. As to these, it is inoperative. I do not think, however, that the obtaining the charter made the parties to it aliens to the church. They did not thereby relinquish church property, nor abdicate church membership. They still cling most pertinaciously to both. They did not set up adverse to the church, nor did they claim the right to exclude their differing brethren.

The charter was irregularly obtained, and does not annul the fundamental rules of the church, as found in their articles of association, as to those who are not parties to it.

To this charge the defendants excepted.

Errors assigned:

1. The court erred in their decisions noted in the several bills of exceptions.

2. In all they said relative to the deed from M. Gress, and the rights acquired thereunder.

3. In what they said about the articles of agreement.

4. In charging the jury, that the only question in the cause was, had defendants a right to do what it was proved they did do.

5. In saying that if the office of minister was vacant, no one could preach there except by consent of church council.

6. In charging that unless defendants had such permission the verdict must be against them.

7. In what they say of the non-effect of the disclaimer and consent of Christian Brown.

8. In all that was said relative to the charter and the rights of the parties thereunder.

III. — E *

9. In the answer to the point propounded by defendant's counsel.

10. In the whole tenor of the charge which recognised the plaintiff's right to recover under the evidence in the cause.

The case was argued by
*Maxwell* and *Porter*, for the plaintiffs in error; and,
*Brown* and *Hepburn, contra.*

The opinion of the Court was delivered by

Sergeant, J. — The merits of this case having been already discussed and decided upon by this court, on the former writ of error, it would be superfluous to travel over the same ground again.   It is necessary chiefly to notice the bills of exception.

1. The first error assigned is to the admission in evidence of the certified copies from the recorder's office, of the articles of agreement, or, as they are entitled, Rules of the Lutheran congregation of the Dryland church.   The objection is, that they are not such a deed or writing as comes within the recording Acts. The Act of 1775 directs the recording of all deeds and conveyances of and concerning lands, tenements or hereditaments, or whereby the same may be any way affected in law or equity.   And by the sixth section, the recorder is to make entry in a book, of every deed or writing brought into his office to be recorded.   In *Hellman* v. *Hellman*, (4 *Rawle*, 444), it is stated by Mr Justice Kennedy, in delivering the opinion of the court, that by the use of the term *writing*, it is shown, that it was not intended to restrict the meaning of the term " conveyances," to deeds; so that conveyances not under hand and seal, of and concerning lands, or whereby they may be affected in law or equity, may be recorded, after being duly proved or acknowledged: and that such deeds, conveyances and writings, as pass or create an interest or right of some kind in land, are within the act.   Nothing, it is believed, is more common than to record articles of agreement for the sale or settlement of lands, or for creating or declaring an interest therein.   The present instrument, whether called a species of conveyance, declaration of trust, or article of agreement, concerns the title to land, and the regulations embraced by it relate to the ownership and mode of enjoying land and buildings thereon.   It begins by reciting, that the two congregations had built the church —that they had taken up 7 or 8 acres of land—that it was to remain in them and their successors' possession for ever.   It then describes its boundaries and site.   It proceeds to declare, that no more than one church and school-house in common are to be erected, the persons who are to pay for them, the number of trustees, and how they and the minister of the church are to be chosen; the modes of conducting public worship there, the rights in the church, and method of repairing the buildings and erecting tomb-stones.   The

instrument therefore, we think, comes within the denomination of " writings by which lands may be affected in law or equity," inasmuch as it declares the title of the owners, defines and fixes their respective rights in the lands and buildings, and regulates the terms and manner in which they are to be for ever thereafter held and enjoyed.

As to the deed, it is rather in nature of a deed of confirmation, than one under which the title to the land was claimed and held. It is long subsequent to the articles, which are themselves subsequent to the taking up and improving the land, the title to which would seem to have begun by occupancy or settlement; for they recite that they had taken up the land, which seems to mean as ground considered and deemed vacant. The effect of the deed, considering it was produced by the church as having been accepted and acted on by them, was, to create trustees to hold for the benefit of the congregations having already a title by settlement. These instruments were accompanied by ancient and continued possession under them, for more than 21 years, and would therefore constitute a title, at least *primâ facie.*

2. It is objected, that Gress could not convey without the consent of the *cestuis que trust.* But the power to convey passes by the grant to Brown and Gress, their heirs and assigns; and Gress being the survivor, could, in the absence of any proceeding to control him, assign to another trustee.

3. The admission of George Frederick as a witness, was objected to. Had it then appeared, as it subsequently did, that he was one of the parties concerned in bringing and carrying on this suit, the objection would have been tenable. But there is nothing in the circumstance of his being one of the church council which has that effect. It does not appear that as such he had any interest in the event of this suit, or would be personally affected by its result.

4. The fourth objection is to the rejection of evidence that Koehler and Shortz were descendants of Koehler and Shortz, whose names were alleged to be signed to the articles of June, 1788. It does not appear how this was pertinent to the case in any way, and if received, would, as far as we can judge, have been immaterial to the case.

5. Evidence of the custom was rightly rejected. It was by the articles and deed the rights of the parties were to be tested.

6. We think the copy of the bond of indemnity was, under the circumstances, admissible as secondary evidence, the obligee who had the original in his custody having admitted in court, when called upon to produce it, that he had burned it. Although his name was necessarily used in the suit, yet he had disclaimed it, and was in an adverse position to the plaintiffs.

The 7th and 8th are the same. This evidence was also properly overruled. It led to nothing. It did not prove whether the

[Shortz v. Unangst.]

charter would have been accepted, if General Shimer had not, as was alleged, misrepresented its contents.  And if that might be conjectured, it was only by the acts of the meeting, their measures could be legally determined.

We concur in the positions laid down by the court below, as to the effect of the charter.

Judgment affirmed.